ARNOLD & PORTER KAYE SCHOLER LLP
MICHAEL A. BERTA (No. 194650)
michael.berta@apks.com
JOSEPH FARRIS (No. 263405)
joseph.farris@apks.com
ADAM M. RAPP (No. 280824)
adam.rapp@apks.com
Three Embarcadero Center, 10th Floor
San Francisco, California 94111-4024
Telephone: 415.471.3100
Facsimile: 415.471.3400

Attorneys for Plaintiff,
ADOBE SYSTEMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADOBE SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>AMPLIENCE, INC. and<br>MARK BUCKINGHAM,<br><br>Defendants. | No.<br><br>Action Filed: April 12, 2017<br><br>**ADOBE SYSTEMS, INC.'S COMPLAINT FOR:<br>(1) BREACH OF CONTRACT;<br>(2) BREACH OF DUTY OF LOYALTY;<br>(3) VIOLATION OF DEFEND TRADE SECRETS ACTS;<br>(4) INTERFERENCE WITH CONTRACTUAL RELATIONS;<br>(5) VIOLATION OF CAL. BUS. & PROF. CODE SECTION 17200; AND<br>(6) CIVIL CONSPIRACY**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Adobe Systems, Inc. ("Adobe"), by its attorneys, alleges as follows:

**INTRODUCTION**

1. This case arises out of a coordinated strategic effort by Defendants Amplience, Inc. ("Amplience") and Mark Buckingham to free-ride on Adobe's time, efforts, and investments in developing confidential information and trade secrets concerning Adobe's Adobe Experience Manager ("AEM") and Scene7 solutions. Adobe has recently learned that over the past few months, Amplience has willfully sought out and obtained Adobe's confidential information and trade secrets through Adobe's former Senior Account Executive Buckingham as part of a deliberate effort to target Adobe's customers and misuse Adobe's intellectual property to unfairly and illegally divert business to Amplience.

2. Adobe is one of the largest and most diversified software companies in the world. Among the solutions that it offers business customers are AEM and Scene7. In brief, AEM is a content management system used by various types of e-commerce providers. Scene7 is a dynamic media solution that integrates with the larger AEM suite of products.

3. Adobe has spent over a decade making substantial investments developing the technologies powering AEM and Scene7 and the business operations that deliver them to its customers. Adobe's efforts to maintain critical information related to these solutions as confidential and proprietary and trade secrets has allowed it to maximize the return on its investments and keep its status as a market leader. Among this valuable confidential information and trade secrets is detailed information about current and prospective customers, product roadmaps and strategic plans, sales materials, information related to the structure of its organization and its employees, and product implementation information.

4. Amplience promotes itself as a direct competitor to Adobe's Scene7 solution. Upon information and belief, while Amplience has historically operated primarily in the European market through Amplience (UK) Limited, in the last few years it has attempted to expand its global presence, including in North America through Amplience, Inc. Based on its own stated intentions, Amplience's primary growth strategy is to specifically take aim at Adobe customers to convince them to "migrate" to Amplience. But, rather than develop this business from the ground up and try

to fairly win over Adobe customers by virtue of its product or efforts, Amplience has opted to take a shortcut—by stealing the playbook from Adobe and siphoning off confidential information through Buckingham, who acted for the benefit of Amplience for more than a month while still actively employed by Adobe.

5. After accepting employment with Amplience in early December 2016, Buckingham immediately began actively misusing his access to Adobe's valuable confidential information and trade secrets to benefit Amplience at the expense of Adobe, despite continuing to work at Adobe until January 16, 2017. On December 8, 2016, Buckingham sought out Adobe proprietary information, including a valuable spreadsheet with detailed compilations of information about dozens of customers and prospective customers, which he obtained by misrepresenting to a colleague that he would delete information in it that he did not need to perform his job duties. Buckingham did not delete any information in that spreadsheet. Instead, he sent it directly to his personal email account once he had accepted a job offer from Amplience.

6. Computer forensic analysis of Buckingham's activities is still ongoing, but additional evidence indicates that Buckingham also transferred to himself additional documents, including by sending other email to his personal account and plugging external media into his computer in the time between accepting his job at Amplience and his departure from Adobe.

7. Buckingham's improper actions did not stop with his misappropriation of confidential information and trade secret documents for use at his new employer. Adobe also has uncovered evidence that Buckingham was actively conferring with Amplience while he remained employed at Adobe and sharing confidential information with Amplience about the sales and technical teams at Adobe, which information was used to solicit Adobe employees.

8. While Adobe welcomes free competition, it cannot tolerate the brazen misappropriation of its confidential information and trade secrets by a departing employee for the direct benefit of a competitor who is in on the scheme. Based on Defendants' actions, Adobe has strong reason to believe that irreparable harm to its business interests has been done or will be done without immediate preliminary relief. Adobe attempted to forestall the need for that relief by reaching out to Amplience before filing this lawsuit, but was unable to obtain adequate assurances

that its information was being protected and not being further misused and, in particular, assurances from Amplience that it was not allowing Buckingham to continue to solicit current and prospective Adobe customers and employees using Adobe's confidential information and trade secrets. Accordingly, Adobe brings this action seeking damages and injunctive relief to remedy the harm wrought by Amplience and Buckingham.

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

9. This Court has subject matter jurisdiction over Adobe's federal trade secret claim pursuant to 18 U.S.C. §§ 1836 *et seq.* and 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

10. This Court has personal jurisdiction over Defendants because each of them has minimum contacts with the Northern District of California and the exercise of jurisdiction in this District is consistent with traditional notions of fair play and substantial justice.

11. Mark Buckingham has numerous contacts with the State of California sufficient to subject him to personal jurisdiction, including the fact that he was employed by Adobe, a company that is based in this state and performed work for Adobe that was closely tied to California. He further agreed that his Proprietary Rights Agreement with Adobe which is the subject of this action would be governed under the laws of California and he specifically consented to personal jurisdiction in this District in that same agreement.

12. Amplience has numerous contacts with the State of California sufficient to subject it to personal jurisdiction, including but not limited to, its efforts to market and sell its products in California, its backing by California investors, its exploration of a possible acquisition by Adobe, its entry into business partnerships with California companies, and its hiring and employment of several employees based in California (including at least one former Adobe employee who worked with Buckingham by the name of Daniel Martino).

13. Venue is proper in this district because a substantial part of the events and omissions giving rise to the claims alleged in this Complaint occurred in this District.

14. This is an intellectual property action and is assigned on a district-wide basis under Civil Local Rules 3-2(c) and 3-5(b). A substantial part of the events giving rise to the claims alleged in this Complaint occurred in the County of Santa Clara, where Adobe is based.

**THE PARTIES**

15. Adobe is a Delaware corporation with its principal place of business in San Jose, California. Founded in 1982, Adobe is one of the largest and most diversified software companies in the world. Adobe offers a line of products and services used by creative professionals, marketers, knowledge workers, application developers, enterprises and consumers for creating, managing, delivering, measuring, optimizing and engaging with compelling content and experiences across multiple operating systems, devices and media. It markets and licenses its products and services directly to enterprise customers through its sales force and to end-users through app stores and its own website at www.adobe.com. Adobe also distributes its products and services through a network of distributors, value-added resellers, systems integrators, independent software vendors, retailers and original equipment manufacturers. In addition, it licenses its technology to hardware manufacturers, software developers and service providers for use in their products and solutions. Its products run on personal and server-based computers, as well as on smartphones, tablets and other devices, around the world.

16. Amplience has promoted itself as a provider of "content management solutions that enable e-commerce business to create and manage the diverse range of content required to create engaging and inspiring shopping experiences." Upon information and belief, Amplience has its United States headquarters in New York City, New York, and is related to Amplience (UK) Limited, which is based in the United Kingdom.

17. Upon information and belief, Mark Buckingham is an individual residing in the state of Georgia.

## BACKGROUND

### A. Adobe Develops Intellectual Property Related to Its Leading AEM and Scene7 Solutions Through Years of Investment

18. Adobe Experience Manager ("AEM") is a leading digital content management solution that helps businesses deliver content to their customers on various platforms, including web, mobile, and the Internet of Things. AEM simplifies the management and delivery of the contents and assets for websites, allowing businesses to deliver compelling and consistent content across various media and regions and using different languages.

19. Adobe's Scene7 and Dynamic Media solutions are a part of the AEM suite of offerings.[1] Scene7 is an integrated rich media management, publishing, and serving environment that delivers to all marketing and selling channels, including the web, print material, e-mail campaigns, web portals, desktops, and devices. Among other things, Scene7 is a tool that allows businesses to enable dynamic imaging for e-commerce sites. This tool allows groundbreaking abilities to present engaging visual content, such as the ability for web users to re-size, edit, zoom, pan, perform 360-degree image spinning, layer images in templates, do color-swatching, and more.

20. In one example of a typical customer use case, an online retailer might contract with Adobe for several years to use Scene7 to power online offerings, allowing them to present their products dynamically. For instance, a furniture retailer's website might allow customers to rotate the furniture to view it from any angle or change the color of the furniture or of the surrounding room in a photo to bring the image to life.

21. Scene7 was originally founded as a separate company based in Novato, California around 2001. Adobe acquired Scene7 in 2007 and has developed and refined the proprietary technology supporting Scene7 for almost a decade in response to the changing needs of its customer base of hundreds of business in North America alone.

---

[1] Adobe AEM users have the option to use two related solutions to work with dynamic media—integrating their instance of AEM with Scene7 or using the Adobe Dynamic Media solution that is integrated into AEM. While the solutions are closely related, depending on individual use cases, users may elect to use one solution or the other, or both.

22. In addition to the intellectual property related directly to the technology for Scene7, Adobe has also developed substantial amounts of confidential information related to the business operations for Scene7, including current and prospective customer information, product roadmaps and strategic plans, deal "pipeline" information, sales materials, information related to the structure of its organization and its employees, and product implementation information.

23. Adobe takes great pains to protect the confidentiality of that information, including requiring its employees to maintain its confidence through contractual obligations, imposing rules and procedures regarding the use and handling on that confidential information, restricting access to individual files and secure computer systems, and sending employees letters reminding them of their proprietary rights obligations upon their separation from the company.

**B. Amplience Positions Itself as a Competitor to Adobe's Scene7**

24. Upon information and belief, Amplience was founded in the United Kingdom in or around 2008. Amplience has promoted itself as a provider of "content management solutions that enable e-commerce businesses to create and manage the diverse range of content required to create engaging and inspiring shopping experiences."

25. Upon information and belief, while Amplience has existed for several years, it was focused primarily on European markets until recent years. Amplience opened its first United States office in 2013. In 2015, it announced a fundraising, which included investments from California-based Silicon Valley Bank to "support the company's continued growth in the North American and Northern European regions."[2]

26. According to Amplience's marketing, its products compete directly with Adobe's Scene7 solution. Amplience even devotes a substantial portion of its website to material purporting to assist customers in the "Migration from Scene7," and promotes its "strong record for supporting retailers through a seamless migration to Amplience – enabling a smooth transition from systems such as Adobe Scene7."[3]

---

[2] http://amplience.com/company/press/item/amplience-closes-10-5-million-in-series-b-funding-to-support-dynamic-global-growth/

[3] http://amplience.com/customers/case-studies/customer-success/scene-7-migration/

### C. Mark Buckingham Works as an Account Executive at Adobe for Almost a Decade and Gains Access to Proprietary Information

27. In 2007, Adobe hired Mark Buckingham as a Senior Account Executive in its salesforce as part of its acquisition of Scene7.

28. As a condition of his employment, Buckingham agreed to an Employee Inventions and Proprietary Rights Assignment Agreement (the "Proprietary Rights Agreement"), which he signed on May 12, 2007. Attached as Exhibit A is a copy of the Proprietary Rights Agreement.

29. In the Proprietary Rights Agreement, Buckingham acknowledged that his employment created "a relationship of confidence and trust between the Company" pursuant to which he would get access to company confidential knowledge, data or information and trade secrets related to the business of Adobe, called "Proprietary Information" under the Proprietary Rights Agreement. The Proprietary Rights Agreement further provided:

> By way of illustration, but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, mask works, ideas; processes, formulas, source and object code, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques; (b) information regarding plans for research, development, products, marketing and selling, business and strategic plans, budgets and unpublished financial statements, contracts, prices and costs, suppliers and customers; (c) information regarding the skills, personal data, and compensation of other employees of the Company, or any of its contractors or service providers; and (d) the existence and substance of any business discussions, negotiations, or agreements between the Company and any third party.

Proprietary Rights Agreement, ¶ 3 (Proprietary Information).

30. Under the Proprietary Rights Agreement, Buckingham agreed to "keep in confidence and trust all Proprietary Information" and to refrain from using or disclosing "any Proprietary Information, or anything directly or indirectly relating to it without the prior written consent of the Company, except as may be necessary in the ordinary course of, and in connection with, performing my duties as an employee of the Company." *Id.* ¶ 4 (Nondisclosure of Proprietary Information).

31. Buckingham further acknowledged that the breach of his obligations with respect to Proprietary Information would result in irreparable and continuing damage to Adobe, which would give rise to a need for injunctive relief. *Id.* ¶ 15 (Injunctive Relief).

32. Under Section 14 of his Proprietary Rights Agreement, Buckingham separately agreed to refrain from competition with the Company while he was employed and solicitation of its employees for a limited time after the termination of his employment:

> (a) during the term of my employment by the Company, I will not, without the Company's express written consent, engage in any employment or business activity that is competitive with, or would otherwise conflict with my employment by the Company, and (b) for the period of my employment with the Company and for two (2) years thereafter, I will not either directly or indirectly, solicit or encourage, or attempt to solicit or encourage any employees, independent contractors, or consultants of the Company to terminate their employment or other service arrangement with the Company.

33. Subject to these agreements, during his time at Adobe, Buckingham was given access to Proprietary Information related to his work as an account executive. For almost a decade, Buckingham used such information to perform his job duties selling to accounts from across Adobe's suite of enterprise solutions, with a particular focus on the retail sector, which is a major market for Adobe's AEM and Scene7 products.

**D. While Still Employed at Adobe, Mark Buckingham Begins Working on Behalf of Amplience to Misappropriate Adobe Confidential Information and Trade Secrets and Solicit Other Adobe Employees**

34. Upon information and belief, at some point in the second half of 2016, Mark Buckingham and Amplience entered discussions regarding the hire of Buckingham to work for Amplience.

35. On or around November 28, 2016, as part of those discussions, Amplience made a job offer to Buckingham.

36. On or around December 5, 2016, Amplience made a second job offer to Buckingham.

37. On December 8, 2016, Buckingham accepted the offer employment from Amplience, agreeing to become VP of Sales for North America, reporting directly to Amplience's Chief Executive Officer James Brooke. His offer letter states that his start date is "to be confirmed in due course."

38. Upon accepting the offer of employment at Amplience, Buckingham did not announce the news to anyone at Adobe.

39. On, December 8, the very same day that he accepted his offer with Amplience, Buckingham sent an email to his colleague Brian Dalton, requesting a copy of a spreadsheet that Buckingham knew contained confidential Adobe information and trade secrets regarding approximately 100 existing and prospective customers that was compiled and cultivated to maximize Adobe's ability to realize on sales (the "2017 Strategic Retail Business Plan"). The 2017 Strategic Retail Business Plan contained confidential contract details, pricing terms, key customer contacts, technology needs, pipeline predictions, heat maps identifying leads, and more. In the hands of a competitor, it could be used to provide strategic direction, jump-start sales, and bypass years of business development efforts.

40. Buckingham did not require access to the 2017 Strategic Retail Business Plan as part of his normal job duties. Instead, he had to request it from Dalton, who sent it to him on December 9. Fully aware that the document contained such highly sensitive information and information not directly relevant to his job duties, Buckingham promised Dalton that upon receiving the "full spreadsheet," Buckingham would "then delete the rest of the stuff on my machine and work off that."

41. Buckingham never deleted any information from the 2017 Strategic Retail Business Plan.

42. Instead, on December 13, Buckingham sent an email from his Adobe account to his personal account, attaching the 2017 Strategic Retail Business Plan. Attached as Exhibit B is a copy of Buckingham's email to himself.

43. Earlier that day, Buckingham had forwarded other documents containing Adobe confidential information related to the sales process to his personal email account from his Adobe email account. Attached as Exhibit C is a copy of that separate email Buckingham sent to himself.

44. Buckingham continued to work at Adobe for weeks after that—including attending, on Adobe's behalf, the company's annual sales kickoff conference in Las Vegas—during the same time period that he was surreptitiously working with Amplience to build a sales team to compete with Adobe.

45. At some point before the National Retail Federation's ("NRF") annual "Big Show" trade convention in the second week of January 2017, Buckingham appears to have corresponded directly with Amplience to convey confidential information to Amplience to use in soliciting employees from Adobe's sales and engineering teams. Adobe has yet to determine the exact date and identity of the person or persons with whom he was corresponding at Amplience because it has recovered only an incomplete portion of the message thus far through forensic analysis. Nonetheless, the content of the correspondence leaves no doubt about the willful nature of Amplience and Buckingham's misuse of Adobe's confidential information to solicit its employees and its customers:

> Dan is in IF - VP Customer Experience or something like that. The job should be about driving software sales NOT about driving services business. Again he will NOT be cheap but worth every penny. Also he said [Adobe Sales Engineer] SUPER BEST SE ever at Scene7 would jump on board if he was VP SC with a team reporting to him and responsibility to create a repeatable successful process of onboarding and follow up to the next level e.g. from Dynamic media to CMS. Could possibly make him an AVP reporting to Dan. If we get Dan then the combination of him and me will make the best of the best come to Amplience for sure. He will now be in NYC week of NRF to meet with us. He has in person interview with [Third Party Company] for a Global evangelist type position. He like good travel and having his ideas actually matter. Free to talk anytime this week you like. Dan IS KEY, [Adobe Employee #2] is good but unlikely, [Adobe Sales Engineer] is VERY Good (not quite a Dan). If we added Dan and/or [Adobe Sales Engineer] along with my presence then I think you can plan on having an A+ sales team lining up because they like me, my drive and vision, but will be skeptical of the technology w/o a Dan or [Adobe Sales Engineer] giving the thumbs up on our stack. BTW, [Adobe Employee #3]'s curiosity is peaked; worth pinging him again, b Please let me know your availability at NRF to lunch/dine with Dan. Cheers, Mark

46. The "Dan" referenced is former Adobe engineer and AEM Product Specialist, Daniel Martino. Martino has since announced his resignation from Adobe and accepted a new job with Amplience. Adobe has learned that in connection with his departure, Martino returned his Adobe computer, apparently after substantially deleting the content of its storage drives.

47. On January 3, 2017, Buckingham finally announced his resignation, which would be effective on January 16.

48. On January 12, 2017, without notifying Adobe, Buckingham attached an external USB drive to his company computer. Forensic evidence shows that the drive contained work-related documents, including what appears to be a copy of the 2017 Strategy Retail Business Plan.

49. Forensic evidence also indicates that on November 18, 2016, several months before his departure and days before getting a job offer from Amplience, Buckingham had also accessed an old Scene7 pricing document on an external drive and viewed old Adobe e-mails and files on Adobe's OneDrive file-share site that he did not appear to have reason to access in the normal course of business.

50. Buckingham's last day of employment at Adobe was January 16, 2017. Upon his departure, Adobe provided a letter to Buckingham reminding him of his obligations to safeguard and return Proprietary Information as he agreed in the Proprietary Rights Agreement. Attached as Exhibit D is a copy of a letter Adobe sent to Buckingham regarding his obligations to return Proprietary Information. Buckingham did not respond to that letter.

**E. Days After Hiring of Buckingham, Amplience Approaches Adobe In An Effort to Be Acquired**

51. On January 31, 2017, investment bank Mooreland Partners, acting on behalf of Amplience, reached out to Adobe to discuss "time sensitive strategic activity" involving Amplience. Pursuant to follow up communications, Adobe learned that the "time sensitive" matter was Amplience's efforts to shop itself for a potential acquisition.

52. On February 14, 2017, Mooreland Partners sent a "Confidential" "Executive Summary" to Adobe that purported to provide an overview of Amplience.

53. The Executive Summary openly declared Amplience's intentions to target Adobe customers for "migration," noting that "Amplience targets multi-channel retailers and single or multi-brand manufacturers, ***with a particular focus on existing Adobe Scene7 customers*** . . ." (emphasis added). The Executive Summary went on to identify specific Adobe accounts that Amplience had purportedly successfully migrated or was planning to target.

54. Most troublingly, in the same document, Amplience appeared to admit that the hiring of Mark Buckingham was explicitly designed to target Adobe customers: "To further help with this initiative, the Company has hired a US VP Sales from Adobe who started in January 2017."

55. Adobe informed Amplience that it was not interested in the proposed acquisition.

56. Upon information and belief, Amplience may still be shopping itself to other companies as a potential acquisition, which creates further risk of the continued or expanded misuse or disclosure of Adobe confidential information.

57. On April 4, after preliminary investigation of this matter revealed the evidence of Amplience's and Buckingham's improper actions, Adobe sent letters to each of them seeking to secure the safe the return of its proprietary information and to assess any potential harm and appropriate remediation efforts related to that harm.

58. On April 7, 2017, Amplience responded through counsel. While it stated it was taking the matter "seriously," Amplience suggested that it would delete critical information in Buckingham's possession relating to the improper use of Adobe's confidential information and trade secrets, rather than preserving that evidence as Adobe had requested. Amplience also failed to take the opportunity to respond to multiple concerns that Adobe raised, including regarding (1) ongoing use of Adobe confidential information and trade secrets by Buckingham, and (2) the continued solicitation of existing and prospective Adobe customers, and current Adobe employees, using that information. Buckingham did not respond at all. Having been unfortunately unable to obtain the assurances its needs to know that its confidential information is secure from further misuse by Amplience and Buckingham, Adobe brings this lawsuit to protect its rights in its confidential information and seek appropriate relief.

## FIRST CLAIM
## (Breach of Contract)
## (Against Mark Buckingham)

59. Adobe re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 58 as though set forth in full herein.

60. Adobe and Defendant Buckingham were parties to the Proprietary Rights Agreement, a valid contract, as alleged herein.

61. Adobe performed all conditions, covenants, and promises required to be performed in accordance with the Proprietary Rights Agreement.

62. Defendant Buckingham materially breached the Proprietary Rights Agreement by engaging in the misconduct alleged herein, including, but not limited to, failing to keep in confidence and trust all Proprietary Information as defined in the Proprietary Rights Agreement; failing to deliver to Adobe all material in his possession incorporating or disclosing Proprietary Information and other information relating to Adobe's business; competing with Adobe during the course of his employment with Adobe and thereafter; and soliciting and encouraging Adobe employees to terminate their employment with Adobe to become employees for Amplience.

63. As a direct and proximate result of Defendant Buckingham's actions as alleged herein, Adobe has suffered significant and direct harm in an amount to be proven at trial.

## SECOND CLAIM
**(Breach of Duty of Loyalty)**
**(Against Mark Buckingham)**

64. Adobe re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 63 as though set forth in full herein.

65. Defendant Buckingham had a relationship with Adobe that gave rise to a duty of loyalty, which prohibited him from preferring a competitor's interests over those of Adobe and taking actions inimical to Adobe's best interests.

66. Defendant Buckingham's actions as alleged herein—including aiding Defendant Amplience while still employed by Adobe; misappropriating Adobe's confidential information and trade secrets; making material misrepresentations and omissions to Adobe personnel; and using the information stolen from Adobe to solicit Adobe's employees to become employees of Amplience—knowingly violated his duty of loyalty to Adobe.

67. As a direct and proximate result of Defendant Buckingham's conduct, Adobe has suffered competitive harm, irreparable injury, and damages in an amount to be proven at trial, including but not limited to loss of exclusivity in the highly sensitive information contained in the 2017 Strategic Retail Business Plan and other Proprietary Information. Absent injunctive relief, Adobe will continue to be harmed by Defendant Buckingham's breaches of his duty of loyalty to Adobe, as Defendants will continue to possess and/or use Adobe's confidential information and trade secrets, for which Adobe lacks an adequate remedy at law (and which Defendant Buckingham

acknowledged in executing the Proprietary Rights Agreement). Accordingly, Adobe seeks temporary, preliminary, and permanent injunctive relief in order to protect its legitimate business interests and secure its confidential information and trade secrets.

**THIRD CLAIM**
**(Violation of Defend Trade Secrets Act of 2016)**
**(Against All Defendants)**

68. Adobe re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 67 as though set forth in full herein.

69. Adobe owns and possesses trade secret information as alleged herein. That information includes, but is not limited to, the 2017 Strategic Retail Business Plan. The 2017 Strategic Retail Business Plan includes critical sales information respecting dozens of Adobe customers and prospective customers, including details of their current contracts with Adobe; customer-specific preferences and technology needs; carefully curated "heat map" information respecting sales leads; deal pipeline information; and other information of significant value to Adobe.

70. Adobe's trade secrets derive independent economic value from not being generally known to or ascertainable by the public and its competitors who could obtain economic value from the disclosures or use of that information.

71. Adobe's trade secrets relate to products and services used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in interstate or foreign commerce.

72. Adobe's trade secrets are the subject of reasonable measures taken by Adobe to keep that information secret and confidential. Those measures include but are not limited to restricting the distribution of such information to those employees with a need to know that information, requiring that employees who are given access to that information sign confidentiality agreements (including the Proprietary Rights Agreement), password protection and/or encryption of instances of that information on Adobe systems and of those Adobe systems themselves; and other measures. As a result of these measures, Adobe's confidential information and trade secrets are not available for use by others through any legitimate means.

73. Defendants misappropriated Adobe's trade secrets in an improper and unlawful manner as herein alleged. Defendants' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.

74. Adobe has been harmed as a direct and proximate result of Defendants' conduct. Defendants' conduct has caused, among other things, competitive harm, irreparable injury, and economic damages in an amount to be proven at trial. Absent injunctive relief respecting Defendants' possession and/or use of Adobe's confidential information and trade secrets, Adobe will continue to be harmed by Defendants' conduct, for which Adobe lacks an adequate remedy at law. Accordingly, Adobe seeks temporary, preliminary, and permanent injunctive relief in order to protect its legitimate business interests and secure its trade secrets.

75. Adobe is further entitled to an award of exemplary damages and/or attorneys' fees.

**FOURTH CLAIM**
**(Interference with Contractual Relations)**
**(Against Amplience, Inc.)**

76. Adobe re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 75 as though set forth in full herein.

77. Adobe and Defendant Buckingham are parties to a valid contract, to wit, the Proprietary Rights Agreement alleged herein.

78. On information and belief, Defendant Amplience, Inc. was aware of the Proprietary Rights Agreement between Adobe and Defendant Buckingham.

79. On information and belief, Defendant Amplience, Inc. undertook intentional acts designed to induce a breach or disruption of the Proprietary Rights Agreement between Adobe and Defendant Buckingham, including but not limited to encouraging Buckingham's improper and unlawful theft and use of Adobe's confidential information and trade secrets to, among other things, improperly solicit Adobe customers and Adobe employees.

80. Defendant Amplience, Inc.'s actions did in fact induce an actual breach of the Proprietary Rights Agreement as alleged herein.

81. As a direct and proximate result of Defendant Amplience, Inc.'s actions, Adobe has suffered competitive harm, irreparable injury, and monetary damages in an amount to be proven at trial.

82. Defendant Amplience, Inc.'s actions as alleged herein were undertaken with oppression, fraud, and/or malice and with a conscious disregard of Adobe's rights. Adobe is thus entitled to an award of exemplary damages.

**FIFTH CLAIM**
**(Violation of Cal. Bus. & Prof. Code Section 17200)**
**(Against All Defendants)**

83. Adobe re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 82 as though set forth in full herein.

84. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices, which include, but are not limited to, misuse of Adobe's confidential information and trade secrets in violation of Buckingham's Proprietary Information Agreement and the Defend Trade Secrets Act of 2016; solicitation of Adobe's employees in violation of Buckingham's Proprietary Information Agreement; and tortious interference with Adobe's contractual relations.

85. Defendants' business acts and practices were unlawful as described herein.

86. Defendants' business acts and practices were unfair in that the harm suffered by Adobe outweighs any potential justification and/or benefit that Defendants may have had for engaging in said acts and practices.

87. Defendants' business acts and practices were fraudulent in that a reasonable person would likely be deceived by their material misrepresentations and omissions. Defendants acquired and used Adobe's confidential information and trade secrets through material misrepresentations and omissions.

88. Adobe has been harmed as a result of Defendants' unlawful, unfair, and fraudulent business acts and practices.

89. As a result of Defendants' unlawful, unfair, and fraudulent business acts and practices, Adobe is entitled to recover restitution in an amount including, but not limited to, all benefits that Defendants received as a result of their unlawful, unfair, and fraudulent business acts

and practices. Adobe is further entitled to an injunction restraining Defendants from further engaging in unfair competition.

**SIXTH CLAIM**
**(Civil Conspiracy)**
**(Against All Defendants)**

90. Adobe re-alleges and incorporates herein by reference each and every allegation contained in paragraphs 1 through 89 as though set forth in full herein.

91. On information and belief, Defendants formed and operated a civil conspiracy to engage in the unlawful, unfair, and fraudulent conduct described herein.

92. Defendants engaged in overt acts in furtherance of their conspiracy as alleged herein, including but not limited to obtaining and misappropriating Adobe's confidential information and trade secrets and using that information to unlawfully solicit Adobe employees.

93. Adobe has been damaged by acts taken in furtherance of Defendants' conspiracy, including but not limited to suffering competitive harm, irreparable injury, and monetary damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Adobe requests relief as follows:

a. For judgment in Adobe's favor and against all Defendants on all causes of action;

b. For temporary, preliminary, and permanent injunctive relief restraining Defendants from further possession and use of Adobe's confidential information and trade secrets, including its use to solicit customers and/or Adobe employees;

c. For damages in an amount proven at trial;

d. For exemplary and/or punitive damages;

e. For attorneys' fees and costs of suit incurred;

f. For prejudgment interest; and

g. Any and all other legal or equitable relief that the Court deems just and proper.

Dated: April 12, 2017

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ Michael A. Berta*
MICHAEL A. BERTA
JOSEPH FARRIS
ADAM M. RAPP

Attorneys for Plaintiff,
ADOBE SYSTEMS, INC.

**REQUEST FOR JURY TRIAL**

Adobe Systems, Inc. hereby requests a jury trial on all issues so triable.

Dated: April 12, 2017

ARNOLD & PORTER KAYE SCHOLER LLP

By: *_/s/ Michael A. Berta_______________*
MICHAEL A. BERTA
JOSEPH FARRIS
ADAM M. RAPP

Attorneys for Plaintiff,
ADOBE SYSTEMS, INC.